IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

ASSOCIATION OF CHRISTIAN SCHOOLS
INTERNATIONAL; SAMARITAN MINISTRIES
INTERNATIONAL; TAYLOR UNIVERSITY; and
INDIANA WESLEYAN UNIVERSITY,

     *Plaintiffs*,

v.

SYLVIA M. BURWELL, in her official capacity as
Secretary of the United States Department of Health and
Human Services; THOMAS E. PEREZ, in his official
capacity as Secretary of the United States Department of
Labor; JACOB J. LEW, in his official capacity as Secretary
of the United States Department of the Treasury;
UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES; UNITED STATES DEPARTMENT
OF LABOR; and UNITED STATES DEPARTMENT OF
THE TREASURY,

     *Defendants*.

---

## VERIFIED COMPLAINT

---

    Plaintiffs Association of Christian Schools International, Samaritan Ministries

International, Taylor University, and Indiana Wesleyan University, by their attorneys, state as

follows:

## NATURE OF THE ACTION

1.      Through their interpretation and implementation of a provision of the Affordable Care Act, 42 U.S.C. § 300gg-13(a)(4), Defendants are forcing the Plaintiffs – four thoroughly religious non-profit organizations – to facilitate access by members of their pro-life faith communities to life-destroying drugs and devices, in violation of their sincerely held religious convictions.   If the Plaintiffs fail to comply, the government will inflict crippling financial penalties upon them.   To protect themselves from this impossible choice, the Plaintiffs ask this Court for declaratory and injunctive relief under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, the First and Fifth Amendments to the United States Constitution, and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

2.      The Plaintiffs are all Christ-centered organizations, dedicated to integrating their Christian convictions into every aspect of their operations.   They believe that God has condemned the intentional destruction of innocent human life.   They hold, as a matter of religious conviction, that it would be sinful and immoral for them intentionally to participate in, pay for, facilitate, enable, or otherwise support access to abortion, which destroys human life. They hold that one of the prohibitions of the Ten Commandments ("thou shalt not murder") precludes them from facilitating, assisting in, serving as the conduct for, or enabling the use of drugs and devices that can and do destroy very young human beings in the womb.   The health benefits they provide to their employees reflect these convictions.

3.      The requirement challenged in this lawsuit is but one of approximately 143 manifestations of the ACA's statutory "preventive services mandate," 42 U.S.C. § 300gg-13(a), which requires many (but not remotely close to all) health plans to cover preventive care and

screenings without cost sharing.   The 143 required coverages include:   55 items recommended by the United States Preventive Services Task Force (USPSTF) (*e.g.*, colorectal cancer screening); 23 immunizations recommended by the Centers for Disease Control and Prevention; 57 screenings and preventive services for children; and eight categories of preventive care and screenings for women (in addition to the 23 female-only items on the USPSTF's 55-item long list).   The eight required women's preventive services are well-woman visits; screening for gestational diabetes; human papillomavirus testing; counseling for sexually transmitted infections; counseling and screening for human immune-deficiency virus; breastfeeding support, supplies, and counseling; screening and counseling for interpersonal and domestic violence; and "[a]ll Food and Drug Administration approved contraceptive methods, and patient education and counseling for all women with reproductive capacity."   Only the last of these is at issue in this case.   Indeed, these Plaintiffs do not object to facilitating access to *any* contraceptive methods – only those that can and do destroy early human life.

4.     It can be conceded for argument's sake that all these requirements advance to some degree the government's broad interests in public health and equality.   But it *cannot* be plausibly maintained that the fate of the entire enterprise rests in any measurable way on forcing these four Plaintiffs to facilitate access to four drugs and devices—which represent one-fifth of one of the 143 required items—particularly when they *are* willing to facilitate access to other drugs, devices, and procedures that prevent pregnancy.   Moreover, the explicit rationale behind the contraceptive mandate ("Mandate") was not nebulous aspirations like "public health" and "equality," but something far more concrete and measurable—the reduction in the adverse health effects associated with the pregnancies that are unintended.   The available evidence

overwhelmingly shows that contraceptive mandates simply do *not* reduce unintended pregnancy rates.   For instance, state contraceptive mandates have not worked; states <u>with</u> such mandates actually have *higher* rates of unintended pregnancy than states <u>without</u> them.

5.      In any event, the government has already conceded that it has *no interest* in imposing the Mandate upon religious employers like the Plaintiffs.   Defendants have acknowledged that it makes no sense to inflict the Mandate upon employers that "are more likely than other employers to employ people of the same faith who share the same objection [to contraception or abortifacients], and who would therefore be less likely than other people to use contraceptive services even if such services were covered under the plan."   78 Fed. Reg. 39,987, 39,874 (Jul. 2, 2013).   All the Plaintiffs *do* employ people of the same faith who share the same objection; under the government's own reasoning, they should be exempt.   But they are not. Without even a hint of empirical support, Defendants irrationally limited its religious exemption to that narrow subclass of religious organizations that has been relieved from the obligation to file informational tax returns.   As a result, inflicting the Mandate on these Plaintiffs will accomplish nothing other than the violation of their consciences.   The notion that imposing the Mandate on these Plaintiffs is the least restrictive means of advancing some compelling government interest is unsupportable, even preposterous.

6.      Unwilling to follow their own stated rationale and exempt the Plaintiffs, Defendants have instead provided an alternative compliance mechanism it erroneously characterizes as an "accommodation."   All these Plaintiffs – and hundreds of other religious organizations – have concluded, as a matter of religiously informed moral analysis, that the accommodation does not sufficiently diminish their ethical objection to complicity with sin.   It

still conscripts the Plaintiffs into the government's scheme, hijacking their health plans and using them as conduits for the delivery of life-destroying drugs and devices to members of their religious communities as a direct consequence of their employment with the Plaintiffs and of their participation in the health benefits the Plaintiffs provide them.

7.      By placing the Plaintiffs in this untenable position, Defendants violate the Religious Freedom Restoration Act; the Free Exercise, Establishment and Free Speech Clauses of the First Amendment to the United States Constitution; the Due Process Clause of the Fifth Amendment; and the Administrative Procedure Act.   The Plaintiffs therefore respectfully request that this Court vindicate their rights through declaratory and permanent injunction relief, among other remedies.

## IDENTIFICATION OF PARTIES AND JURISDICTION

8.      Plaintiff Association of Christian Schools International (ACSI) is a Christ-centered educational organization located in Colorado Springs, Colorado.   It is a Colorado not-for-profit corporation.

9.      Plaintiff Samaritan Ministries International (SMI) is a Christian ministry that operates a Health Care Sharing Ministry, and is located in Peoria, Illinois.   It is an Illinois not-for-profit corporation.

10.      Plaintiff Taylor University (Taylor) is a Christ-centered institution of higher learning located in Upland, Indiana.   It is an Indiana not-for-profit corporation.

11.      Plaintiff Indiana Wesleyan University (IWU) is a Christ-centered institution of higher learning located in Marion, Indiana.   It is an Indiana not-for-profit corporation.

12.     Defendants are appointed officials of the United States government and United States Executive Branch agencies responsible for issuing and enforcing the Mandate.

13.     Defendant Sylvia Burwell is the Secretary of the United States Department of Health and Human Services (HHS).   In this capacity, she has responsibility for the operation and management of HHS.   Burwell is sued in her official capacity only.

14.     Defendant HHS is an executive agency of the United States government and is responsible for the promulgation, administration and enforcement of the Mandate.

15.     Defendant Thomas E. Perez is the Secretary of the United States Department of Labor.   In this capacity, he has responsibility for the operation and management of the Department of Labor.   Perez is sued in his official capacity only.

16.     Defendant Department of Labor is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

17.     Defendant Jacob J. Lew is the Secretary of the Department of the Treasury.   In this capacity, he has responsibility for the operation and management of the Department.   Lew is sued in his official capacity only.

18.     Defendant Department of Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

19.     This action arises under the Constitution and laws of the United States.   The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361, jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §

2000bb-1, 5 U.S.C. § 702, and Fed. R. Civ. P. 65, and to award reasonable attorney's fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and 42 U.S.C. § 1988.

20.     Venue lies in this district pursuant to 28 U.S.C. § 1391(e).   A substantial part of the events or omissions giving rise to the claim occurred in this district, and ACSI is located in this district.

<u>**FACTUAL ALLEGATIONS**</u>

**I.     ACSI**

   **A.** ***ACSI's Religious Beliefs and Provision of Educational Services in General***

21.     ACSI was established in 1978, when several regional U.S. school associations joined together to be a united voice to advance excellence in Christian education by inspiring, challenging, and being a resource for educators and schools.

22.     ACSI advances excellence in Christian schools by enhancing the professional and personal development of Christian educators and by providing support functions for Christian schools. ACSI provides teacher and administrator certification, school accreditation, legal and legislative help, and curriculum publishing. ACSI supports nearly 24,000 associated schools and their more than 5.5 million students in 100 different countries.

23.     ACSI's mission is to "strengthen Christian schools and equip Christian educators worldwide as they prepare students academically and inspire them to become devoted followers of Jesus Christ."

24.     ACSI draws its staff from among those who profess and demonstrate a strong commitment to the Lord Jesus Christ and reflect a biblically integrated lifestyle. A vital part of fulfilling ACSI's mission is hiring staff and administrators that believe in ACSI's Statement of

Faith and are committed to following ACSI's Lifestyle Statement which lays out the responsibilities and expectations for living life as a Christian role model and reflect biblical integrity in all areas of their lives by demonstrating a teachable spirit, a willingness to live contentedly, and an ability to love others—even from the very beginning of life at conception.

25.     ACSI employs approximately 140 people.

## B.  *The Religious Beliefs of ACSI Regarding Abortion*

26.     ACSI unreservedly believes that the procurement of, participation in, facilitation of, or payment for abortion (including abortion-causing drugs and devices like Plan B, ella, and IUDs) violates the Sixth Commandment and is inconsistent with the dignity conferred by God on creatures made in His image.

27.     ACSI believes, in accordance with Scripture, that life begins at conception (Psalm 139:13-16, Luke 1:39-41) and so, from that moment forward, life in the womb is sacred and worthy of protection and respect.

28.     Based on the Bible's religious and moral teachings, ACSI sincerely believes that the termination of the life of a preborn child by, among other means, abortion-inducing drugs and devices, and related education and counseling, including by means of acting after fertilization to prevent the newly formed embryo from implanting into his or her mother's uterus or to dislodge it after it was recently implanted, is an intrinsic evil and a sin against God for which ACSI will be held accountable. Therefore, elective abortion or any abortifacient is morally wrong to ACSI.

29.     ACSI, by its principles, decisions, and policies, seeks to conduct its operations in compliance with these beliefs.

C. *ACSI's Group Health Plan*

30.    To fulfill its religious commitments and duties as a Christ-centered organization, ACSI promotes the spiritual and physical well-being and health of its employees.   This includes the provision of generous health insurance to employees and their dependents.

31.    Consistent with its religious commitments, ACSI offers self-insured coverage administered through a third-party administrator, Meritain Health, Inc., which is a subsidiary of Aetna and uses the Aetna health insurance network.

32.    Approximately 111 employees are enrolled in health insurance plans sponsored by ACSI.   Approximately 125 dependents of employees are covered.   The plans thus cover approximately 236 individuals.

33.    ACSI employee health plans cover a variety of contraceptive methods that are not abortifacient.

34.    However, consistent with its religious commitments, ACSI's plan excludes coverage for ella and Plan B, which can and sometimes do act after fertilization has occurred.

35.    ACSI currently offers a point of service health plan to its employees. The deductibles are $1,000 per person and $2,000 per family. The out-of-pocket maximum on expenses is $1,000 per person in-network/$2,000 out-of-network, and $2,000 per family in-network/$4,000 out-of-network. Under the plan, beneficiaries make a $20 co-pay for office visits and $10/$20/$30 prescription co-pays.   The ACSI plan also provides 20% co-insurance for emergency room services.

36.    Since the enactment of the Affordable Care Act in 2010, ACSI's plan has possessed "grandfathered" status and, as a consequence, has not been subject to the Mandate.

On January 1, 2015, the terms of the plan will change, and the plan will lose its grandfathered status.   Employees will contribute more to the cost of health insurance.   Prior to the imminent changes, ACSI covered 100% of health insurance premiums.   Beginning January 1, 2015, employees will make a contribution towards premiums on a monthly basis.   More specifically, employees will contribute each month $75 for single coverage; $125 for the employee plus one child; $175 for an employee and spouse; and $200 for family coverage.   ACSI will also increase the deductibles and out-of-pocket maximums, and add a health savings account option.

## II.      Samaritan Ministries International

### A.   *Religious Beliefs and Provision of Religious Services in General*

37.      SMI was established in 1991 and in1994 began a Health Care Sharing Ministry with 10 families sharing their healthcare costs.   By 1996, there were 200 families sharing healthcare costs through SMI.   Within ten years, SMI was serving 10,000 households who were sharing their healthcare costs, praying for each other, and sending each other notes of encouragement.   Currently, more than 38,000 households participate in the ministry.

38.      Under SMI's need sharing process, SMI members send a monthly amount of money or "shares" directly to another member with a medical expense.   Members who have needs in a given month send their bills to SMI who process them, and then send out a monthly newsletter detailing members' needs and directing members on where they need to send their money.   SMI works to balance out the members' needs and shares, using surpluses from months where there are more shares than needs to lower the total amount of shares needed.   If there are months where more needs arise than shares, then SMI uses a prorating process to ensure than the shares are evenly divided.

39.     SMI's mission in operating a Health Care Sharing Ministry is to provide Christians with a Biblical, non-insurance approach to healthcare by helping believers meet each others' medical and spiritual needs in cooperation with the local church.   SMI members are required to agree to abide by a statement of faith.   SMI and its members have set up this Health Care Sharing Ministry because they believe it most closely fulfills the Bible's call for Christians to "[b]ear one another's burdens and so fulfill the law of Christ."   (Galatians 6:2).

40.     SMI draws its staff and administrators from among those who profess Jesus Christ as Lord and personal savior and who believe that everything they do in their lives should be done for the glory of God.   SMI employs individuals who unreservedly sign (and annually reaffirm) SMI's Statement of Faith and adhere to its lifestyle expectations.   Because of the emphasis on employee's personal faith and walk with God, SMI employees contribute directly to the spiritual tone and success of SMI as a whole.   SMI hires individuals who are committed to the local church, to personal and regular devotional time reading the Bible and in prayer, and who have "genuine concern for the salvation of souls and spiritual welfare of the members of Samaritan Ministries International."   (SMI Employee Qualifications).

41.     Two-thirds of SMI's board of directors are elected by members, and the board oversees the administrative staff and ministry operations.

42.     SMI currently has 117 full-time employees and 16 part-time employees.

**B.  *The Religious Beliefs of Samaritan Ministries International Regarding Abortion***

43.     SMI unreservedly believes that the procurement of, participation in, facilitation of, or payment for abortion (including abortion-causing drugs and devices like Plan B, ella, and

11

IUDs) violates the Sixth Commandment and is inconsistent with the dignity conferred by God on creatures made in His image.

44.     SMI believes, in accordance with Scripture, that life begins at conception (Psalm 139:13-16, Luke 1:39-41) and so, from that moment forward, life in the womb is sacred and worthy of protection and respect.

45.     Based on the Bible's religious and moral teachings, SMI sincerely believes that the termination of the life of a preborn child by, among other means, abortion-inducing drugs and devices, and related education and counseling (including by means that act after fertilization to prevent the newly formed embryo from implanting into his or her mother's uterus or to dislodge it after it was recently implanted) is an intrinsic evil and a sin against God for which SMI will be held accountable.   Therefore, elective abortion or any the use of any abortifacient is morally wrong to SMI, and violates its religious convictions.

46.     SMI, by its principles, decisions, and policies, seeks to conduct its operations in compliance with these beliefs.

47.     SMI does not cover abortion through its Health Care Sharing Ministry nor through employee health coverage.

**C. *Samaritan Ministries International Healthcare Plans***

48.     To fulfill its religious commitments and duties as a Christ-centered organization, SMI promotes the spiritual and physical well-being and health of its employees and their dependents.

49.     Consistent with its religious commitments, SMI offers self-insured coverage, administered through a third-party administrator (Entrust, Inc.).   SMI offers employees the

Samaritan Ministries Employee Benefit Plan, which is a minimum essential coverage plan with a high deductible and a health savings account.

50.     Approximately 114 SMI employees have chosen to participate in SMI's self-insured plan.

51.     The plan year for SMI employee coverage begins on December 1 of each year.

52.     The current SMI plan excludes all contraceptives.

53.     Beginning on December 1, 2014, SMI's plan will cover non-abortifacient contraceptives.   However, consistent with its religious commitments, SMI's health plan will exclude ella, Plan B, and IUDs.

54.     On December 1, 2013, SMI certified that the organization qualified for the Temporary Enforcement Safe Harbor (Safe Harbor).   As a result, SMI's plan has been protected from application of the Mandate.

55.     As applied to SMI, the Safe Harbor will expire on December 1, 2014, and SMI will at that point become subject to the Mandate.

56.     For plan years that began 2012 and prior, SMI provided employees with coverage through a health reimbursement arrangement.   SMI provided singles with a $700 annual reimbursement allowance and families with $1,400.   Any amount not used in a given year carried over to the following year.   In 2013, SMI started offering employees a high deductible health plan with a health savings account.   The annual deductible and out-of-pocket maximum is $3,000 per individual and $6,000 per family.

### III.    Taylor University

#### A.  *Taylor University's Religious Beliefs and Provision of Educational Services in General*

57.     Taylor University was established in 1846 as Fort Wayne Female College. Taylor's initial purpose was to educate women, preparing them for teaching careers.

58.     Taylor is a private, Christian, liberal arts college located in Upland, Indiana.   As an interdenominational liberal arts university of evangelical faith, Taylor seeks to create an intentional Christian community, where students are challenged to integrate their faith and learning in an environment of relentless spiritual and intellectual discovery.

59.     Taylor's mission is to develop servant leaders marked with a passion to minister Christ's redemptive love and truth to a world in need.   Taylor carries out its mission by preparing graduates who integrate biblical faith and learning and engage the world around them in a Christ-centered way.   Taylor fosters a servant-leader mentality in the university culture while providing students with learning experiences that are biblically anchored and liberal arts grounded—experiences that are imbued with a vital Christian interpretation of truth and life which foster student intellectual, emotional, physical, vocation, social, and spiritual development.

60.     Taylor draws its faculty, staff, and administration from among those who profess and demonstrate a strong commitment to the Lord Jesus Christ and evangelical Christianity.   An integral part of fulfilling Taylor's mission is electing trustees and hiring faculty, staff, and administrators who believe the Taylor University Statement of Faith and are committed to following Taylor's "Life Together Covenant," which lays out the responsibilities and

14

expectations for community life at Taylor—including the responsibility to love God and others by recognizing that all persons from their conception are made in the image of God.

61.     Although Taylor does not require a profession of faith as a prerequisite for student admission, Taylor describes itself as a discipleship-focused institution that is geared towards encouraging spiritual growth within the student body.   All students agree to and are expected to follow the "Life Together Covenant."

62.     Taylor's current enrollment is approximately 1,900.

63.     Taylor has approximately 641 employees, of whom approximately 425 are full-time.

### B. *The Religious Beliefs of Taylor University Regarding Abortion*

64.     Taylor University unreservedly believes that the procurement of, participation in, facilitation of, or payment for abortion (including abortion-causing drugs and devices like Plan B and ella) violates the Sixth Commandment and is inconsistent with the dignity conferred by God on creatures made in His image.

65.     Taylor's "Life Together Covenant" declares that loving God and loving others means that, "[a]ll persons are created in the image of God, and each person is known by God and knit together in the womb with intentional design.   God's attention to creative detail is uniquely applied in each person in whom is given the capacity to love God with heart, soul, mind and strength.   (Psalm 139:13-14; Mark 12:29-31; 1 Corinthians 6:19)."

66.     The "Life Together Covenant" also contains a specific "Sanctity of Life Statement," which declares in part as follows:   "Scripture affirms the sacredness of human life, which is created in the image of God.   Genesis 1:27 (NIV) states:   So God created man in His

own image, in the image of God He created him; male and female He created them.   Therefore, human life must be respected and protected from its inception to its completion."

C. *Taylor University's Group Health Plan*

67.   To fulfill its religious commitments and duties in the Christ-centered educational context, Taylor promotes the spiritual and physical well-being and health of its employees.   This includes the provision of generous medical, prescription drug and dental benefits to employees and their dependents.

68.   Consistent with its religious commitments, Taylor provides these benefits through a self-insured health plan that it maintains and sponsors, and that is administered by a third-party administrator, Automated Group Administration of Fort Wayne, Indiana.

69.   Approximately 437 Taylor employees are enrolled in the self-insured health plan, and approximately 761 dependents of these employees are covered under the plan.   The health plan also covers 47 retired employees and 23 of their spouses.   The health plan thus covers a total of approximately 831 individuals.

70.   The plan year for Taylor's self-insured health plan begins on June 1 of each year.

71.   Taylor's health plan covers a variety of contraceptive methods that are not abortifacient.

72.   However, consistent with its religious commitments, Taylor's self-insured health plan does not cover abortifacients (including ella and Plan B), which can and sometimes do act after fertilization has occurred

73.   Taylor's health plan currently possesses "grandfathered" status and is thus not subject to the Mandate.

74.     Currently Taylor's health plan provides for an annual deductible for hospital services equal to $760 per individual and $1,520 per family.   The out-of-pocket maximum for hospital services is $630 per individual and $1,260 for family for exclusive provider organization hospitals; $1,630 per individual and $3,260 per family for PPO hospitals; and $2,500 per individual and $5,000 per family for non-PPO hospitals.   The annual deductible for physician and non-hospital services is $760 per individual and $1,520 per family.   The out-of-pocket maximum for physician and non-hospital services at PPO providers is $630 per individual and $1,260 per family.   For non-PPO providers, the out-of-pocket maximum is $2,500 per individual and $5,000 per family.   The health plan sets office visit co-pays at $30. Emergency room visits cost plan participants $95, and prescription drug benefit copayments are $15/$25/$45.

75.     Based on current facts, it is likely that Taylor will make a number of changes, effective June 1, 2015, that will cause its health plan to lose its "grandfathered" status.   Four months into the current plan year, Taylor's plan is already $275,000 "in the red."   This financial reality, if it continues, will very likely make it necessary for Taylor increase its plan deductibles and out-of-pocket expenses.   Employees will also have to pay an increased share of the monthly premium.

## IV.     Indiana Wesleyan University

### A.  *IWU's Religious Beliefs and Provision of Educational Services in General*

76.     Indiana Wesleyan University was established in 1920, originally named Marion College.   The Indiana Conference of the Wesleyan Methodist Church had purchased Marion Normal Institute in 1919 with the desire to start a institute of higher learning for the Wesleyan Methodist Church.

77.     IWU is a private, evangelical, Christian comprehensive university dedicated both to liberal arts and professional education.   IWU's residential campus and primary location is in Marion, Indiana, with regional education centers throughout Indiana, Kentucky, and Ohio.   As an institution of the Wesleyan Church, IWU seeks to provide students with an academically excellent Christ-centered university experience that is focused on helping students find their life calling and developing their leadership abilities.   IWU's faculty, staff, and administration cultivate a culture of innovation that is geared towards providing students with the highest quality Christian education possible.

78.     IWU's mission, as a Christ-centered academic community, is to change the world by developing students in character, scholarship, and leadership.   IWU carries out its mission by helping students to integrate their faith with their learning—examining life and learning in light of faith in Christ and the practical implications of living out that faith in the world through service.   The University sets high standards for both faculty and students, with the goal of creating world changers who can think critically, communicate effectively, and write persuasively.   IWU emphasizes leadership through its Center for Life Calling and Leadership, which helps students discover their skills and abilities—and how that fits into following Christ's example of servant leadership.

79.     IWU hires faculty and staff who are dedicated Christians, have a personal relationship with Jesus Christ, and possess an unwavering commitment to an evangelical faith that is rooted in the rich Wesleyan Methodist tradition.   IWU employees desire to use their God-given skills, experiences, and passions to help the University provide high-quality Christian education to men and women of all ages.   IWU also only hires individuals who can affirm and

follow its "Educational Mission and Employment Standards" and its "Community Lifestyle Statement."

80.     Although IWU does not require a profession of faith as a prerequisite for student admission, IWU expects that all students respect the University's Christian heritage and sign a "Community Values Contract."

81.     Approximately 3,000 students are currently enrolled on the main Marion campus, with an additional 12,000 taking classes online or at satellite locations.

82.     IWU has approximately 3,565 employees, of whom approximately 1,018 are full-time.

**B. *The Religious Beliefs of IWU Regarding Abortion***

83.     Indiana Wesleyan University unreservedly believes that the procurement of, participation in, facilitation of, or payment for abortion (including abortion-causing drugs and devices like Plan B and ella) violates the Sixth Commandment and is inconsistent with the dignity conferred by God on creatures made in His image.

84.     As an institution of the Wesleyan Church, IWU subscribes to the Wesleyan Church's belief that human life is sacred because it is a gift of God and that human beings are made in the image of God. (Genesis 1:27). The Wesleyan Church's statement on abortion says:

> We believe that abortion is the taking of human life; therefore, society brings grave danger to itself by permitting abortion on demand, and thus treating God-given life so lightly. We call our members to oppose this social evil with great vigor. However, we reject the use of violence as a means of bringing about this needed change in society. Except in the case of risk to the life of the mother, The Wesleyan Church stands firm against the evil of abortion—both the personal evil of abortion by any individual among us and the worldwide social evil of abortion, which we believe must someday end. Until that day, we will instruct our people to avoid this sin personally, and call them to the work of enlightening a blind culture, as we once did with the sin of slavery.

85.     IWU hosted an Indiana Right to Life event on campus on September 20, 2014. The proceeds of the event went toward supporting a local Pregnancy Help Center.   Also, IWU hosts a student chapter of Students for Life whose mission is the following:

> Members of Students for Life work to save lives threatened by induced abortion, euthanasia, and destruction of human embryos for research.   Members seek to promote respect for life at IWU and in the surrounding community, to educate on life issues, to help those in need so that life is a promising choice, and to work with others who share common goals, accomplishing all by peaceful, non-violent means.

## C.  *IWU's Group Health Insurance Plans*

86.     To fulfill its religious commitments and duties in the Christ-centered educational context, IWU promotes the spiritual and physical well-being and health of its employees.   This includes the provision of generous health insurance to employees and their dependents.

87.     Consistent with its religious commitments, IWU offers self-insured coverage with an administrative services-only agreement, administered through a third-party administrator, Anthem Blue Cross Blue Shield of Indiana.   IWU offers two choices:   a "Traditional Plan PPO" and a "High Deductible Health Savings Plan."

88.     Approximately 890 employees are enrolled in health insurance plans sponsored by IWU.   Approximately 1,684 dependents of employees are covered.   The plans thus cover approximately 2,574 individuals.

89.     The plan year for IWU employee health insurance coverage begins on January 1 of each year.

90.     IWU employee health plans cover a variety of contraceptive methods that are not abortifacient.

91.     However, consistent with its religious commitments, IWU's contract with its third-party administrator states that ella, Plan B, and IUDs, which can and sometimes do act after fertilization has occurred, are excluded.

92.     Currently, under the Traditional Plan PPO, the overall deductible for individuals in-network is $500 and $1,000 out-of-network; for families, it is $1,500 in-network and $3,000 out of network.   The out-of-pocket maximum for individuals in-network is $3,000/$6,000 out-of-network; for families, it is $6,000 in-network/$12,000 out-of-network.   Office visits require a $25 co-pay in-network/40% co-insurance out-of-network, and emergency room visits are 20% co-insurance.   The traditional plan also has a $5/$30/$45 prescription drug plan. Under the High Deductible Health Savings Plan, the overall deductible for individuals in-network is $1,500 and $3,000 out-of-network; for families, it is $3,000 in-network and $6,000 out of network.   The out-of-pocket maximum for individuals in-network is $3,500/$8,000 out-of-network; for families, it is $7,000 in-network/$16,000 out-of-network.   Office visits are rated at 20% co-insurance in-network/40% co-insurance out-of-network, and emergency room visits are 20% co-insurance.   The health savings account plan also has a 20% co-insurance in-network/40% co-insurance out-of-network prescription drug plan.

93.     Effective January 1, 2015, IWU will make a number of changes to its plan that will cause the plan to lose its "grandfathered" status."   IWU plans to increase its plan deductibles and co-pays.   Also, employees will be required to contribute more toward the insurance premiums.   IWU is also implementing a new rule which will limit spousal eligibility to spouses of IWU employees who do not work for employers who offer group coverage.

### V.      The ACA and Defendants' Mandate Thereunder

94.      In March 2010, Congress passed, and President Obama signed, the Patient

Protection and Affordable Care Act, Pub. L. No. 111-148 (March 23, 2010), and the Health Care

and Education Reconciliation Act, Pub. L. No. 11-152 (March 30, 2010), together known as the

"Affordable Care Act" (ACA).

95.      The ACA regulates the national health insurance market by directly regulating

"group health plans" and "health insurance issuers."

96.      One ACA provision requires that any "group health plan" or "health insurance

issuer offering group or individual health insurance coverage" provide coverage for certain

preventive care services.   42 U.S.C. § 300gg-13(a).

97.      These services include screenings, medications, and counseling given an "A" or

"B" rating by the United States Preventive Services Task Force; immunizations recommended by

the Advisory Committee on Immunization Practices of the Centers for Disease Control and

Prevention; and "preventive care and screenings" specific to infants, children, adolescents, and

women that are subsequently "provided for in comprehensive guidelines supported by the Health

Resources and Services Administration," an HHS sub-agency.   42 U.S.C. § 300gg-13(a)(1)-(4).

98.      These services must be covered without "any cost sharing."   42 U.S.C. §

300gg-13(a).

The Interim Final Rule

99.      On July 19, 2010, HHS published an Interim Final Rule regarding the ACA's

requirement that certain preventive services be covered without cost sharing.   75 Fed. Reg.

41726, 41728 (2010).

100.    HHS issued the Interim Final Rule without a prior notice of rulemaking or opportunity for public comment.   Defendants determined for themselves that "it would be impracticable and contrary to the public interest to delay putting the provisions . . . in place until a full public notice and comment process was completed."   75 Fed. Reg. at 41730.

101.    Although Defendants suggested in the Interim Final Rule that they would solicit public comments after implementation, they stressed that "provisions of the Affordable Care Act protect significant rights" and therefore it was expedient that "participants, beneficiaries, insureds, plan sponsors, and issuers have certainty about their rights and responsibilities."   *Id.*

102.    Defendants stated they would later "provide the public with an opportunity for comment, but without delaying the effective date of the regulations," demonstrating their intent to impose the regulations without regard to concerns that might be raised in public comments. *Id.*

103.    After the Interim Final Rule was issued, numerous commenters warned against the potential conscience implications of requiring religious individuals and organizations to include certain kinds of services—specifically contraception, sterilization, and abortion services—in their health care plans.

104.    HHS directed a private health policy organization, the Institute of Medicine (IOM), to make recommendations regarding which drugs, procedures, and services all health plans should cover as preventive care for women.

105.    In developing its guidelines, IOM invited a select number of groups to make presentations on the preventive care that should be included in health plans by force of law. These were the Guttmacher Institute, the American Congress of Obstetricians and Gynecologists

(ACOG), John Santelli, the National Women's Law Center, National Women's Health Network, Planned Parenthood Federation of America, and Sara Rosenbaum.

106.    No religious groups or other groups that opposed government-mandated coverage of contraception, sterilization, abortion, and related education and counseling were among the invited presenters.

107.    On July 19, 2011, the IOM published its preventive care guidelines for women, including a recommendation that preventive services include "[a]ll Food and Drug Administration approved contraceptive methods [and] sterilization procedures" and related "patient education and counseling for women with reproductive capacity."   Institute of Medicine, Clinical Preventive Services for Women: Closing the Gaps, at 102-10 and Recommendation 5.5 (July 19, 2011).

108.    FDA-approved contraceptive methods include birth-control pills; prescription contraceptive devices such as IUDs; Plan B (also known as the "morning-after pill") and its chemical cognates; ulipristal (also known as "ella" or the "week-after pill"); and other drugs, devices, and procedures.

109.    Some of these drugs and devices—including "emergency contraceptives" such as Plan B and ella and certain IUDs—are known abortifacients, in that they can cause the death of an embryo by preventing it from implanting in the wall of the uterus.

110.    Indeed, the FDA's own Birth Control Guide states that Plan B and its cognates, ella, and IUDs can work by "preventing attachment (implantation) to the womb (uterus)."   FDA, Office of Women's Health, Birth Control Guide at 16-18, *available as* Addendum to Brief of

Appellants at 50, *Hobby Lobby Stores Inc. v. Sebelius*, No. 12-6294, ECF Doc. No. 010189999834 (10th Cir. filed Feb. 11, 2013).

111.    The manufacturers of some of the drugs, methods, and devices in the category of "FDA-approved contraceptive methods" indicate that they can function to cause the demise of an early embryo.

112.    The requirement for related "education and counseling" accompanying abortifacients, sterilization and contraception necessarily covers education and counseling given in favor of such items, even though it might also include other education and counseling. Moreover, it is inherent in a medical provider's decision to prescribe one of these items that she is taking the position that use of the item is in the patient's best interests, and therefore her education and counseling related to the item will be in favor of its proper usage.

113.    On August 1, 2011, a mere 13 days after IOM published its recommendations, HRSA issued guidelines adopting them in full.   See http://www.hrsa.gov/womensguidelines.

114.    Insurance plans starting after August 1, 2012 were subject to the Mandate.

115.    Any non-exempt employer providing a health insurance plan that omits any abortifacients, contraception, sterilization, or education and counseling for the same, is subject (because of the Mandate) to heavy fines approximating $100 per affected beneficiary per day. Such employers are also vulnerable to lawsuits by the Secretary of Labor and by plan participants.

116.    A large employer entity cannot freely avoid the Mandate by simply refusing to provide health insurance to its employees, because the ACA imposes monetary penalties on entities that do not offer medical coverage to their full-time employees.

117.    The annual penalty for failing to provide health insurance coverage is $2,000 times the total number of the employer's full-time employees, minus 30.

The Religious Employer Exemption

118.    On the very same day HRSA adopted the IOM's recommendations, HHS promulgated a Second Interim Final Rule regarding the preventive services mandate.   76 Fed. Reg. 46621 (published Aug. 3, 2011).

119.    This Second Interim Final Rule granted HRSA "discretion to exempt certain religious employers from the Guidelines where contraceptive services are concerned."   76 Fed. Reg. 46621, 46623 (emphasis added).   The term "religious employer" was restrictively defined as one that (1) has as its purpose the "inculcation of religious values"; (2) "primarily employs persons who share the religious tenets of the organization"; (3) "serves primarily persons who share the religious tenets of the organization"; and (4) "is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended."   76 Fed. Reg. at 46626 (emphasis added).

120.    The statutory citations in the fourth prong of this test refer to "churches, their integrated auxiliaries, and conventions or associations of churches" and the "exclusively religious activities of any religious order."   26 U.S.C. § 6033(a)(3).

121.    The "religious employer" exemption was thus extremely narrow, limited to churches, their integrated auxiliaries, and religious orders, but only if (1) their purpose is to inculcate faith and (2) they hire and serve primarily people of their own faith tradition.

122.    HRSA exercised its discretion to grant an exemption for religious employers via a footnote on its website listing the Women's Preventive Services Guidelines.   The footnote states

that "guidelines concerning contraceptive methods and counseling described above do not apply to women who are participants or beneficiaries in group health plans sponsored by religious employers."   *See* http://www.hrsa.gov/womensguidelines.

123.    Although religious organizations like the Plaintiffs share the same religious beliefs and concerns as objecting churches, their integrated auxiliaries, and objecting religious orders, HHS ignored the regulation's impact on their religious liberty, stating that the exemption sought only "to provide for a religious accommodation that respects the unique relationship between a house of worship and its employees in ministerial positions."   76 Fed. Reg. 46621, 46623.

124.    Therefore, the vast majority of organizations with conscientious objections to providing contraceptive or abortifacient services were excluded from the "religious employer" exemption.

125.    Like the original Interim Final Rule, the Second Interim Final Rule was made effective immediately, without prior notice or an opportunity for public comment.

126.    Defendants acknowledged that "while a general notice of proposed rulemaking and an opportunity for public comment is generally required before promulgation of regulations," they had "good cause" to conclude that public comment was "impracticable, unnecessary, or contrary to the public interest" in this instance.   76 Fed. Reg. at 46624.

127.    Upon information and belief, after the Second Interim Final Rule was put into effect, over 100,000 comments were submitted opposing the narrow scope of the "religious employer" exemption and protesting the Mandate's infringement on the rights of religious individuals and organizations.

128.    HHS did not take into account the concerns of religious organizations in the comments submitted before the Second Interim Rule was issued.   HHS was unresponsive to numerous and well-grounded assertions that the Mandate violated statutory and constitutional protections of rights of conscience.

The Temporary Enforcement Safe Harbor

129.    The public outcry for a broader religious employer exemption continued for many months.   On January 20, 2012, HHS issued a press release acknowledging "the important concerns some have raised about religious liberty" and stating that religious objectors would be "provided an additional year . . . to comply with the new law."   See Jan. 20, 2012 Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius, available at http://www.hhs.gov/news/press/2012pres/01/20120120a.html.

130.    On February 10, 2012, HHS formally announced a "Temporary Enforcement Safe Harbor" (Safe Harbor) for non-exempt nonprofit religious organizations that objected to covering contraceptive and/or abortifacient services.

131.    HHS declared that it would not take any enforcement action against an eligible organization during the Safe Harbor period, which would extend until the first plan year beginning after August 1, 2013.

132.    HHS also indicated it would develop and propose changes to the regulations in an effort to accommodate the religious liberty objections of non-exempt, nonprofit religious organizations following the expiration of the Safe Harbor.

133.    Despite the Safe Harbor and HHS's accompanying promises, on February 10, 2012, HHS announced a Final Rule "finalizing, without change," the contraception and

abortifacient Mandate and narrow religious employer exemption.   77 Fed. Reg. 8725-01 (published Feb. 15, 2012).

The Advance Notice of Proposed Rulemaking

134.     On March 21, 2012, HHS issued an Advance Notice of Proposed Rulemaking (ANPRM), presenting "questions and ideas" to "help shape" a discussion of how to "maintain the provision of contraceptive coverage without cost sharing," while accommodating the religious beliefs of non-exempt religious organizations.   77 Fed. Reg. 16501, 16503 (2012).

135.     The ANPRM conceded that forcing religious organizations to "contract, arrange, or pay for" the objectionable contraceptive and abortifacient servicers would infringe their "religious liberty interests."   *Id.* (emphasis added).

136.     The ANPRM proposed, in vague terms, that the "health insurance issuers" for objecting religious employers could be required to "assume the responsibility for the provision of contraceptive coverage without cost sharing."   *Id.*

137.     "[A]pproximately 200,000 comments" were submitted in response to the ANPRM, 78 Fed. Reg. 8456, 8459, largely restating previous comments that the government's proposals would not resolve conscientious objections, because the objecting religious organizations, by providing a health care plan in the first instance, would still be coerced to arrange for and facilitate access to morally objectionable services.

The Notice of Proposed Rulemaking

138.     On February 1, 2013, HHS issued a Notice of Proposed Rulemaking (NPRM) purportedly addressing the comments submitted in response to the ANPRM.   78 Fed. Reg. 8456 (published Feb. 6, 2013).

29

139.    The NPRM proposed two changes to the then-existing regulations.   78 Fed. Reg. 8456, 8458-59.

140.    First, it proposed revising the religious employer exemption by eliminating the requirements that religious employers have the purpose of inculcating religious values and primarily employ and serve only persons of their same faith.   78 Fed. Reg. at 8461.

141.    Under the NPRM's proposal, a "religious employer" would be one "that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code."   78 Fed. Reg. at 8461.

142.    HHS emphasized, however, that this proposal "would not expand the universe of employer plans that would qualify for the exemption beyond that which was intended in the 2012 final rules."   78 Fed. Reg. 8456, 8461.

143.    In other words, religious organizations like the Plaintiffs that are not churches, integrated auxiliaries, or religious orders would continue to be denied the protection of the exemption.

144.    Second, the NPRM followed up on HHS's earlier-stated intention to "accommodate" non-exempt, nonprofit religious organizations by making them "designate" their insurers and third party administrators to provide plan participants and beneficiaries with free access to contraceptive and abortifacient drugs and services.

145.    The proposed "accommodation" did not resolve the concerns of religious organizations like the Plaintiffs because it continued to force them to deliberately provide health insurance that would trigger access to abortion-inducing drugs and related education and counseling.

30

146.    "[O]ver 400,000 comments" were submitted in response to the NPRM, 78 Fed.

Reg. 39870, 39871, with religious organizations again overwhelmingly decrying the proposed

"accommodation" as a violation of their religious liberty because it would conscript their health

care plans as the main cog in the government's scheme for expanding access to contraceptive

and abortifacient services.

147.    On April 8, 2013, the very day that the notice-and-comment period ended,

then-Secretary Sebelius answered questions about the contraceptive and abortifacient services

requirement in a presentation at Harvard University.

148.    In her remarks, Secretary Sebelius stated:

> We have just completed the open comment period for the so-called accommodation, and by August 1st of this year, every employer will be covered by the law with one exception.   Churches and church dioceses as employers are exempted from this benefit.   But Catholic hospitals, Catholic universities, other religious entities will be providing coverage to their employees starting August 1st. . . . [A]s of August 1st, 2013, every employee who doesn't work directly for a church or a diocese will be included in the benefit package.

See The Forum at Harvard School of Public Health, A Conversation with Kathleen Sebelius,

U.S. Secretary of Health and Human Services, Apr. 8, 2013, available at

http://theforum.sph.harvard.edu/events/conversation-kathleen-sebelius (Episode 9 at 2:25)

(emphasis added).

149.    Given the timing of these remarks, it is clear that Defendants gave no

consideration to the comments submitted in response to the NPRM's proposed

"accommodation."

150.     Moreover, Secretary Sebelius' remarks belie the assertion that objecting employers are not "providing coverage for" morally objectionable items in the health insurance plans they provide employees.

The Final Mandate

151.     On June 28, 2013, Defendants issued a Final Rule (the "Final Mandate"), which ignores the objections repeatedly raised by religious organizations and others and continues to co-opt objecting employers into the government's scheme of expanding free access to contraceptive and abortifacient services.   78 Fed. Reg. 39870 (2013).   Defendants declared that the Final Mandate would be effective August 1, 2013, only one month after it was issued.

152.     Under the Final Mandate, the discretionary "religious employer" exemption, which is still implemented via footnote on the HRSA website, see http://www.hrsa.gov/womensguidelines, remains limited to churches, integrated auxiliaries, and religious orders "organized and operate[d]" as nonprofit entities and "referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code."   78 Fed. Reg. at 39874.

153.     Defendants attempt to justify the extraordinarily narrow religious exemption as follows:   "The Departments believe that the simplified and clarified definition of religious employer continues to respect the religious interests of houses of worship and their integrated auxiliaries in a way that does not undermine the governmental interests furthered by the contraceptive coverage requirement.   Houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people of the same faith who share the same objection, and who would therefore be less

likely than other people to use contraceptive services even if such services were covered under their plan." 78 Fed. Reg. at 39874.

154.    All other organizations, including the Plaintiffs, are denied the exemption's protection.

155.    The Plaintiffs do not fall within the scope of this narrow religious exemption. They are not churches, the integrated auxiliaries of a church, or conventions or associations of churches, nor do they perform the exclusively religious activities of a religious order.

156.    The Plaintiffs employ people of the same faith who share the same objection to abortifacients, and are therefore less likely than other people to use abortifacients and related counseling even if such services were made available through their plans.

157.    The Final Mandate created a separate "accommodation" for certain non-exempt religious organizations. 78 Fed. Reg. at 39874. The accommodation is an alternative means by which an employer complies with the Final Mandate.

158.    An organization is eligible for the accommodation if it (1) "[o]pposes providing coverage for some or all of the contraceptive services required"; (2) "is organized and operates as a nonprofit entity"; (3) "holds itself out as a religious organization"; and (4) "self-certifies that it satisfies the first three criteria." 78 Fed. Reg. at 39874.

159.    The Plaintiffs are eligible for the so-called accommodation.

160.    The self-certification described in the Final Rule must be executed "prior to the beginning of the first plan year to which an accommodation is to apply." 78 Fed. Reg. at 39875.

161.    The Final Rule also extended the current Temporary Enforcement Safe Harbor to plans starting before the end of 2013, only six months after the issuance of the Final Rule.   78 Fed. Reg. at 39889.

162.    Thus, under the Final Rule, an eligible organization would need to execute the self-certification prior to its first plan year that begins on or after January 1, 2014, and deliver it to the organization's insurer.   If the organization has a self-insured plan, it would deliver the executed self-certification to the plan's third party administrator.   78 Fed. Reg. at 39875.

The August 27, 2014 Interim Final Rule

163.    On August 27, 2014, Defendants issued Interim Final Rules purportedly "augmenting" the so-called accommodation.   79 Fed. Reg. 51,092.   The Interim Final Rules simply provide entities eligible for the accommodation an alternative mechanism for invoking that accommodation (which is itself simply an alternative means of *complying with* the Final Mandate.)

164.    Under these Interim Final Rules, an entity may, in addition to utilizing the mechanism set forth in the June 28, 2013, Final Rule, invoke the accommodation by "notify[ing] HHS in writing of its religious objection to coverage of all or a subset of contraceptive services." 79 Fed. Reg. 51,094.   Entities need not use EBSA Form 700 in communicating with HHS.

165.    The written notice contemplated by the August 27, 2014, Interim Final Rules "must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on sincerely held religious beliefs to providing coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and

type . . .; and the name and contact information for any the plan's third party administrators and health insurance issuers."   79 Fed. Reg. at 51,094.

166.    When a self-insured plan sends such a notice to HHS, Defendant Department of Labor will send a notification to each third-party administrator of the entity's plan.   The third-party administrator will then execute its tasks under the so-called accommodation, thereby providing the very drugs and devices to an employer's beneficiaries to which the religious employer objects, as an inevitable consequence of the employer's decision to provide employee health insurance and of its performance of indispensable tasks in the government's scheme.

167.    "The DOL notification will be an instrument under which the plan is operated and shall supersede any earlier designation."   79 Fed. Reg. at 51,095.

168.    Defendant DOL claims, implausibly, that it "is exercising is broad rulemaking authority under Title I of ERISA, which includes the ability to interpret and apply the definition of plan administrator under ERISA section 3(16)(A)."   *Id.*

169.    If it elects to invoke the accommodation with respect to its employee plan, ACSI would be required to invoke the accommodation before January 1, 2015, when its plan will lose grandfathered status and thus its protection from the Final Mandate.

170.    If it elects to invoke the accommodation with respect to its employee plan, SMI would be required to invoke the accommodation before December 1, 2014, when it loses the protection of the Temporary Enforcement Safe Harbor.

171.    If it elects to invoke the accommodation with respect to its employee plan, IWU would be required to invoke the accommodation before January 1, 2015, when its plan will lose grandfathered status and thus its protection from the Final Mandate.

172.     If it elects to invoke the accommodation with respect to its employee plan, Taylor would be required to invoke the accommodation before June 1, 2015, when its plan will lose grandfathered status and thus its protection from the Final Mandate.

173.     By invoking the accommodation, Plaintiffs would trigger their third-party administrators' provision of or arrangement for payments for the morally objectionable abortifacients.   78 Fed. Reg. 39892-39893.   These payments constitute coverage of the items to which Plaintiffs object.   *See, e.g., id.* at 39872.   These payments also are treated as coverage under the consumer protection requirements of the Public Health Service Act and ERISA.   *Id.* at 39876.   This coverage will not be contained in any insurance policy separate from Plaintiffs' plans.   *See id.*

174.     By invoking the so-called accommodation via written notice to HHS, Plaintiffs would be identifying their third-party administrators to the government for the distinct purpose of enabling the government's scheme to facilitate free access to abortifacient services for members of their pro-life religious communities.

175.     Under the accommodation, the Plaintiffs and every other non-exempt objecting religious organization would continue to play a central role in facilitating free access to abortifacient services.

176.     In sum, the accommodation is nothing more than a shell game that attempts to disguise the religious organization's role as the central cog in the government's scheme for expanding access to contraceptive and abortifacient services.

177.     Despite the accommodation's convoluted machinations, a religious organization's decision to offer health insurance (which the ACA's employer mandate requires in order to avoid

significant penalties) and its invocation of the accommodation continue to serve as triggers for creating access to free abortifacient services to its employees and plan beneficiaries from the same third-party administrator they are paying to administer their health plan.

178.    The Plaintiffs cannot participate in or facilitate the government's scheme in this manner without violating their religious convictions.

The Final Mandate and Plaintiffs' Health Insurance Plans

179.    SMI becomes subject to the Final Mandate on December 1, 2014.   ACSI and IWU become subject to the Final Mandate on January 1, 2015.   Taylor will become subject to the Final Mandate on June 1, 2015.   As a result, the Plaintiffs now – or will soon – face a choice.   They can transgress their religious commitments by including abortifacients in their plans or by triggering their third-party administrators to provide the exact same services by invoking the accommodation.   Or they can transgress their religious duty to provide for the well-being of their employees and their families by dropping their employee health   plans altogether in order to avoid being complicit in the provision of abortifacients, thereby incurring crippling annual fines.   Or, if their third-party administrators would agree, they might choose to offer health plans that exclude objectionable items and incur the $100 per beneficiary per day penalty.

180.    The Plaintiffs' religious convictions forbid them from participating in any way in the government's scheme to provide free access to abortifacient services through their health care plans.

181.    Dropping their insurance plans would place the Plaintiffs at a severe competitive disadvantage in their efforts to recruit and retain employees.

182.     The Final Mandate forces the Plaintiffs to deliberately provide health insurance that would facilitate free access to emergency contraceptives, including Plan B, ella, and IUDs.

183.     The Final Mandate forces the Plaintiffs to facilitate government-dictated education and counseling concerning abortion that directly conflicts with their religious beliefs and teachings.

184.     Facilitating this government-dictated speech directly undermines the express speech and messages concerning the sanctity of life that the Plaintiffs seek to convey.

185.     The Final Mandate therefore imposes substantial burdens on the religious beliefs and exercise of each of the Plaintiffs.

The Governmental Interests Allegedly Underlying the Final Mandate and the Availability of Other Means of Pursuing Those Interests

186.     Coercing Plaintiffs to facilitate access to morally objectionable abortifacients advances no compelling governmental interest.

187.     The required drugs, devices, and related services to which Plaintiffs object are already widely available at non-prohibitive costs.

188.     Upon information and belief, Plan B is widely available for between $30 and $65. Upon information and belief, ella is widely available for approximately $55.

189.     There are numerous alternative mechanisms through which the government could provide access to the objectionable drugs and services without conscripting objecting organizations and their health plans in violation of their religious beliefs.

190.     For example, it could pay for the objectionable services through its existing network of family planning services funded under Title X, through direct government payments, or through tax deductions, refunds, or credits.

191.    The government could simply exempt all conscientiously objecting organizations, just as it has already exempted the small subset of nonprofit religious employers that are referred to in Section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.

192.    In one form or another, the government also provides exemptions for grandfathered plans, 42 U.S.C. § 18011; 75 Fed. Reg. 41,726, 41,731 (2010), small employers with fewer than 50 employees, 26 U.S.C. § 4980H(c)(2)(A), and certain religious denominations, 26 U.S.C. § 5000A(d)(2)(a)(i) and (ii) (individual mandate does not apply to members of "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds).   26 U.S.C. § 5000A(d)(2)(b)(ii) (individual mandate does not apply to members of "health care sharing ministry" that meets certain criteria).

193.    These broad exemptions further demonstrate that the Plaintiffs could be exempted from the Final Mandate without measurably undermining any sufficiently important governmental interest allegedly served by the Final Mandate.

194.    Employers who do not make modifications to their insurance plans that deprive the plans of "grandfathered" status may continue to use those grandfathered plans indefinitely.

195.    Indeed, HHS itself has predicted that large number of employees will continue to use grandfathered plans.   75 Fed. Reg. 34538 (June 17, 2010); *see also* http://web.archive.org/web/20130620171510/http://www.healthcare.gov/news/factsheets/2010/06/keeping-the-health-plan-you-have-grandfathered.html (archived version); https://www.cms.gov/CCIIO/Resources/Files/Factsheet¬_ grandfather_amendment.html (noting that amendment to regulations " will result in a small increase in the number of plans retaining their grandfathered status relative to the estimates made in the grandfathering regulation").

196.     In the ACA, Congress chose to impose a variety of requirements on grandfathered health plans, but not the Mandate—in other words, Congress decided that the Mandate was not important enough to impose to the benefit of tens of millions of women.   Congress did not even think abortifacients were important enough to codify as part of this Mandate—as far as Congress is concerned, the Mandate need not include abortifacients at all.

197.     The Administration's postponement of the employer mandate (and its attendant penalties) from 2014 to 2015 also belies any claim that a compelling interest justifies coercing Plaintiffs to comply with the Final Mandate, as employers may now simply decide not to provide their employee health plans without incurring fines under 26 U.S.C. § 4980H, at least through 2014 and, for fiscal year plans, into 2015.

198.     These broad exemptions also demonstrate that the Final Mandate is not a general law entitled to some measure of judicial deference.

199.     The available evidence does not support Defendants' contention that making contraceptives, abortifacients, and related counseling available without cost sharing decreases the rate of unintended pregnancy or the adverse impacts on health and equality that allegedly flow from the unintended nature of a pregnancy.

200.     Defendants were willing to exempt various secular organizations and postpone the employer mandate, while adamantly refusing to provide anything but the narrowest of exemptions for religious organizations.

201.     The Final Mandate was promulgated by government officials, and supported by non-governmental organizations, who strongly oppose religious teachings and beliefs regarding marriage, family, and life.

202.    Defendant Sebelius, for example, has long been a staunch supporter of abortion rights and a vocal critic of religious teachings and beliefs regarding abortion and contraception.

203.    On October 5, 2011, six days after the comment period for the original Interim Final Rule ended, Defendant Sebelius gave a speech at a fundraiser for NARAL Pro-Choice America.   She told the assembled crowd that "we are in a war."

204.    She further criticized individuals and entities whose beliefs differed from those held by her and the others at the fundraiser, stating: "Wouldn't you think that people who want to reduce the number of abortions would champion the cause of widely available, widely affordable contraceptive services?   Not so much."

205.    On July 16, 2013, Secretary Sebelius further compared opponents of the Affordable Care Act generally to "people who opposed civil rights legislation in the 1960s," stating that upholding the Act requires the same action as was shown "in the fight against lynching and the fight for desegregation."   *See* http://www.hhs.gov/secretary/about/speeches/sp20130716.html.

206.    Consequently, on information and belief, the Plaintiffs allege that the purpose of the Final Mandate, including the restrictively narrow scope of the religious employers exemption, is to discriminate against religious organizations that oppose contraception and abortion.

## FIRST CLAIM FOR RELIEF
### Violation of the Religious Freedom Restoration Act
### 42 U.S.C. § 2000bb

207.    Plaintiffs reallege all matters set forth in paragraphs 1-206 and incorporate them herein.

208.     The Plaintiffs' sincerely held religious beliefs prohibit them from providing, paying for, making accessible, or facilitating coverage or payments for abortion, abortifacients, embryo-harming pharmaceuticals, and related education and counseling, or providing or facilitating a plan that causes access to the same through an insurance company, third-party administrator, or any other third party.

209.     When the Plaintiffs comply with the Ten Commandments' prohibition on murder and with other sincerely held religious beliefs, they exercise religion within the meaning of the Religious Freedom Restoration Act.

210.     The Final Mandate imposes a substantial burden on the Plaintiffs' religious exercise and coerces them to change or violate their religious beliefs.

211.     The Final Mandate chills the Plaintiffs' religious exercise within the meaning of RFRA and pressures them to abandon their religious convictions and religious practices.

212.     The Final Mandate exposes the Plaintiffs to substantial fines and/or financial burdens for their religious exercise.

213.     The Final Mandate exposes the Plaintiffs to substantial competitive disadvantages because of uncertainties about their health benefits caused by the Mandate.

214.     The Final Mandate furthers no compelling governmental interest and is not narrowly tailored to any compelling governmental interest.

215.     The Final Mandate is not the least restrictive means of furthering Defendants' stated interests.

216.     The Final Mandate and Defendants' threatened enforcement thereof violates the Plaintiffs' rights protected by the Religious Freedom Restoration Act.

217.    Absent injunctive and declaratory relief against application and enforcement of the Final Mandate, the Plaintiffs will suffer irreparable harm.

**SECOND CLAIM FOR RELIEF**
**Violation of Free Exercise Clause of the First Amendment**
**to the United States Constitution**

218.    Plaintiffs reallege all matters set forth in paragraphs 1–206 and incorporate them herein.

219.    The Plaintiffs' sincerely held religious beliefs prohibit them from providing, paying for, making accessible, or otherwise facilitating coverage or payments for abortion, abortifacients, embryo-harming pharmaceuticals, and related education and counseling, or providing or facilitating a plan that causes access to the same through an insurance company or third-party administrator.

220.    When the Plaintiffs comply with the Ten Commandments' prohibition on murder and with other sincerely held religious beliefs, they exercise religion within the meaning of the Free Exercise Clause.

221.    The Final Mandate is not neutral and is not generally applicable.

222.    Defendants have created categorical exemptions and individualized exemptions to the Mandate.

223.    The Final Mandate furthers no compelling governmental interest.

224.    The Final Mandate is not the least restrictive means of furthering Defendants' stated interests.

225.    The Final Mandate coerces the Plaintiffs to change or violate their religious beliefs.

226.     The Final Mandate chills the Plaintiffs' religious exercise.

227.     The Final Mandate exposes the Plaintiffs to substantial fines and/or financial burdens for their religious exercise.

228.     The Final Mandate exposes the Plaintiffs to substantial competitive disadvantages, in that it makes it unclear what health benefits they can offer to their employees.

229.     The Final Mandate substantially burdens the Plaintiffs' religious exercise.

230.     The Final Mandate is not narrowly tailored to any compelling governmental interest.

231.     Despite being informed in detail of the religious objections of thousands of individuals and organizations, Defendants designed the Final Mandate and the religious exemption therefrom to target the Plaintiffs and others like them, thereby making it impossible for the Plaintiffs and other similar religious organizations to comply with their religious beliefs without suffering crippling punishments.

232.     Defendants promulgated both the Final Mandate and the religious exemption in order to suppress the religious exercise of the Plaintiffs and others.

233.     By design, Defendants framed the Final Mandate to apply to some religious organizations but not others, resulting in discrimination among religions.

234.     The Final Mandate violates the Plaintiffs' rights secured to them by the Free Exercise Clause of the First Amendment to the United States Constitution.

### THIRD CLAIM FOR RELIEF
**Violation of the Establishment Clause of the**
**First Amendment to the United States Constitution**

235.     Plaintiffs reallege all matters set forth in paragraphs 1–206 and incorporate them herein.

236.     The First Amendment's Establishment Clause, together with the Free Exercise Clause, requires the equal treatment of all religious faiths and institutions without discrimination or preference.   It prohibits the unjustified differential treatment of similarly situated religious organizations.

237.     The Final Mandate's narrow exemption for "religious employers" discriminates among religions on the basis of religious views, religious status, or incidental institutional structure or affiliation.

238.     The Final Mandate adopts a particular theological view of what is morally acceptable complicity in the facilitation of abortifacient coverage and payments, and imposes it upon those, like the Plaintiffs, who conscientiously object, and who must either conform their consciences or suffer penalty.

239.     The Establishment Clause, together with the Free Exercise Clause, also protects the freedom of religious organizations to decide for themselves, free from governmental interference, matters of internal governance as well as those of doctrine and practice.

240.     Under the First Amendment, government may not interfere with a religious organization's internal decisions concerning its religious structure, leadership, practice, discipline, membership, or doctrine.

241.     Under the First Amendment, government may not interfere with a religious organization's internal decisions if that interference would affect the faith and mission of the organization itself.

242.     The Plaintiffs made an internal decision, dictated by their Christian faith, that the health plans they make available to employees may not include, subsidize, provide, pay for, or in any way facilitate access to abortifacient drugs, devices, or related services.

243.     The Final Mandate interferes with the Plaintiffs' internal decisions concerning their structure and mission by requiring them to subsidize, provide access to, and facilitate practices that directly conflict with their Christian beliefs.

244.     The Plaintiffs also made internal decisions to not be structured as integrated auxiliaries to a church, denomination, or association of churches.

245.     The Final Mandate's narrow religious exemption unconstitutionally punishes the Plaintiffs for this structural choice, and pressures them to become integrated auxiliaries of a church or denomination in order to gain the protection of the exemption.

246.     Because the Final Mandate interferes with the Plaintiffs' internal decision making in a manner that affects their faith and mission, it violates the Establishment Clause (and Free Exercise Clause) of the First Amendment.

247.     Absent injunctive and declaratory relief against the Final Mandate, the Plaintiffs will suffer irreparable harm.

### FOURTH CLAIM FOR RELIEF
**Violation of the Free Speech Clause of the First Amendment
to the United States Constitution**

248.     Plaintiffs reallege all matters set forth in paragraphs 1–206 and incorporate them herein.

249.    Defendants' requirement to provide coverage for education and counseling regarding contraception causing abortion forces the Plaintiffs to speak in a manner contrary to their religious beliefs.

250.    The Plaintiffs teach that abortion violates God's law and that any participation in the unjustified taking of an innocent human life contradicts their religious beliefs and convictions.

251.    The Final Mandate compels the Plaintiffs to facilitate expression and activities that the Plaintiffs teach are inconsistent with their religious beliefs, expression, and practices.

252.    The Final Mandate compels the Plaintiffs to facilitate access to government-dictated education and counseling related to abortion.

253.    Defendants thus violate the Plaintiffs' rights to be free from compelled speech, a right secured to them by the Free Speech Clause of the First Amendment.

254.    The Final Mandate's compelled speech requirement does not advance a compelling governmental interest.

255.    Defendants have no narrowly tailored compelling interest to justify this compelled speech.

256.    The Final Mandate violates the Plaintiffs' rights secured to them by the Free Speech Clause of the First Amendment to the United States Constitution.

257.    Absent declaratory and injunctive relief, the Plaintiffs will suffer irreparable harm.

## FIFTH CLAIM FOR RELIEF
**Violation of the Due Process Clause of the
Fifth Amendment to the United States Constitution**

258.     Plaintiffs reallege all matters set forth in paragraphs 1–206 and incorporate them herein.

259.     Because the Final Mandate sweepingly infringes upon religious exercise and speech rights that are constitutionally protected, it is unconstitutionally vague in violation of the due process rights of the Plaintiffs and other parties not before the Court.

260.     Persons of common intelligence must necessarily guess at the meaning, scope, and application of the Final Mandate and its exemptions.

261.     This Final Mandate lends itself to discriminatory enforcement by government officials in an arbitrary and capricious manner, and lawsuits by private persons, based on the government's vague standard.

262.     The Final Mandate vests Defendants with unbridled discretion in deciding whether to allow exemptions to some, all, or no organizations that possess religious beliefs and/or that meet the government's definition of "religious employers."

263.     The Final Mandate violates the Plaintiffs' due process rights under the Fifth Amendment to the United States Constitution.

### SIXTH CLAIM FOR RELIEF
**Violation of the First Amendment to the United States Constitution**
**Freedom of Expressive Association**

264.     Plaintiffs reallege all matters set forth in paragraphs 1–206 and incorporate them herein.

265.     The Plaintiffs teach that abortion violates God's law and that any participation in the unjustified taking of an innocent human life contradicts their religious beliefs and convictions.

266.     The Mandate compels the Plaintiffs to facilitate expression and activities that the Plaintiffs teach are inconsistent with their religious beliefs, expression, and practices.

267.     Defendants' actions thus violate the Plaintiffs' right of expressive association protected by the Free Speech Clause of the First Amendment to the United States Constitution.

## SEVENTH CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act

268.     Plaintiffs reallege all matters set forth in paragraphs 1–206 and incorporate them herein.

269.     Because they did not give proper notice and an opportunity for public comment, Defendants did not take into account the full implications of the regulations by completing a meaningful consideration of the relevant matter presented.

270.     Defendants did not consider or respond to the voluminous comments they received in opposition to the Interim Final Rule.

271.     Defendants issued their regulations on an interim final basis and only asked for comments thereafter.   Yet Defendants signaled from regulatory text of their Interim Rules that they had no intention of considering the requests by religious organizations to provide them with exemptions, or to hold the effective date of their rules after the received and considered all the comments submitted.

49

272.    Thus, Defendants imposed their rules without the required "open-mindedness" that agencies must have when notice-and-comment occurs.   Defendants also did not have good cause to impose the rules without prior notice and comment.

273.    Defendants have violated the notice and comment requirements of 5 U.S.C. §§ 553 (b) and (c), have taken agency action not in accordance with procedures required by law, and the Plaintiffs are entitled to relief pursuant to 5 U.S.C. § 706(2)(D).

274.    In promulgating the Mandate, Defendants failed to consider the constitutional and statutory implications of the mandate on the Plaintiffs and similar organizations.

275.    Defendants' explanation (and lack thereof) for their decision not to exempt the Plaintiffs and similar religious organizations from the Mandate runs counter to the evidence submitted by religious organizations during the comment period.

276.    Thus, Defendants' issuance of the Mandate was arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because the Mandate fails to consider the full extent of its implications and it does not take into consideration the evidence against it.

277.    As set forth above, the Mandate violates RFRA and the First and Fifth Amendments.

278.    The Mandate is also contrary to the provision of the ACA that states that "nothing in this title"—i.e., title I of the Act, which includes the provision dealing with "preventive services"—"shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year."   Section 1303(b)(1)(A).

279.     The Mandate is also contrary to the provisions of the Weldon Amendment of the

Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, Public

Law 110 329, Div. A, Sec. 101, 122 Stat. 3574, 3575 (Sept. 30, 2008), which provides that

"[n]one of the funds made available in this Act [making appropriations for Defendants

Department of Labor and Health and Human Services] may be made available to a Federal

agency or program . . . if such agency, program, or government subjects any institutional or

individual health care entity to discrimination on the basis that the health care entity does not

provide, pay for, provide coverage of, or refer for abortions."

280.     The Mandate also violates the provisions of the Church Amendment, 42 U.S.C. §

300a-7(d), which provides that "No individual shall be required to perform or assist in the

performance of any part of a health service program or research activity funded in whole or in

part under a program administered by the Secretary of Health and Human Services if his

performance or assistance in the performance of such part of such program or activity would be

contrary to his religious beliefs or moral convictions."

281.     The Mandate is contrary to existing law and is in violation of the APA under 5

U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.       That this Court enter a judgment declaring the Mandate and its application to

Plaintiffs and their health plans, insurance issuers, or third-party administrators to be a violation

of their rights protected by RFRA, the Free Exercise, Establishment, and Free Speech Clauses of

the First Amendment to the United States Constitution, the Due Process Clause of the Fifth

Amendment to the United States Constitution, and the Administrative Procedure Act;

B.       That this Court enter preliminary and permanent injunctions prohibiting

Defendants from continuing to apply the Mandate to the Plaintiffs and their health plans,

insurance issuers, or third-party administrators or in a way that violates the legally protected

rights of any person, and prohibiting Defendants from continuing to illegally discriminate against

Plaintiffs by requiring them to provide health coverage or access to separate payments for

contraceptives, abortifacients, and related counseling to their employees;

C.       That this Court award Plaintiffs court costs and reasonable attorney's fees, as

provided by the Equal Access to Justice Act and RFRA (as provided in 42 U.S.C. § 1988); and

D.       That this Court grant such other and further relief as to which the Plaintiffs may

be entitled.

Respectfully submitted this 31st day of October, 2014.

_s/ Gregory S. Baylor_
Gregory S. Baylor (TX Bar No. 01941500)
Matthew S. Bowman (DC Bar No. 993261)
ALLIANCE DEFENDING FREEDOM
801 G Street, NW, Suite 509
Washington, DC 20001
(202) 393-8690
(202) 347-3622 (facsimile)
gbaylor@alliancedefendingfreedom.org
mbowman@alliancedefendingfreedom.org

David A. Cortman (GA Bar No. 188810)
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road, NE, Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)

dcortman@alliancedefendingfreedom.org

Kevin H. Theriot (KS Bar No. 21565)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
ktheriot@alliancedefendingfreedom.org

Michael J. Norton (CO Bar No. 6430)
ALLIANCE DEFENDING FREEDOM
7951 E. Maplewood Avenue, Suite 100
Greenwood Village, CO 80111
(720) 689-2410
(303) 694-0703 (facsimile)
mjnorton@alliancedefendingfreedom.org

Paul M. Brodersen* (IL Bar No. 06308648)
J. Brian Heller* (IL Bar No. 06180273 )
P.O. Box 213
Washington, IL 61571-0213
309-444-9223
309-444-9723 (facsimile)
paul.brodersen@samaritanministries.org
jbhpc@comcast.net
*Attorneys for Samaritan Ministries International*

Tara Schulstad Sciscoe* (IN Bar No. 18145-49)
Brian Paul* (IN Bar No. 22501-29)
ICE MILLER, LLP
One American Square, Suite 2900
Indianapolis, IN 46282
317.236.5888
317.592.4751 (facsimile)
tara.sciscoe@icemiller.com
brian.paul@icemiller.com
*Attorneys for Taylor University*

*Motions for *pro hac vice* to be submitted

**<u>VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746</u>**

I declare under penalty of perjury that the foregoing allegations regarding Association of Christian Schools International are true and correct to the best of my knowledge.

Executed on October 31, 2014.

<u>*s/Thomas Cathey*</u>
Dr. Thomas Cathey*
Association of Christian Schools International

*\*I certify that I have the signed original of this document, which is available for inspection at any time by the Court or a party to this action.*

## **VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I declare under penalty of perjury that the foregoing allegations regarding Samaritan Ministries International are true and correct to the best of my knowledge.

Executed on October 31, 2014.

*s/Ted Pittenger*
Ted Pittenger*
President, Samaritan Ministries International

*I certify that I have the signed original of this document, which is available for inspection at any time by the Court or a party to this action.*

## **VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746**

I declare under penalty of perjury that the foregoing allegations regarding Taylor

University are true and correct to the best of my knowledge.

Executed on October 31, 2014.

*s/Jeffrey A. Moshier*

Dr. Jeffrey A. Moshier

Provost, Taylor University

*\*I certify that I have the signed original of this document, which is available for inspection at any time by the Court or a party to this action.*

## <u>VERIFICATION OF COMPLAINT ACCORDING TO 28 U.S.C. § 1746</u>

I declare under penalty of perjury that the foregoing allegations regarding Indiana Wesleyan University are true and correct to the best of my knowledge.

Executed on October 31, 2014.

<u>*s/David Wright*</u>
Dr. David Wright
President, Indiana Wesleyan University

*\*I certify that I have the signed original of this document, which is available for inspection at any time by the Court or a party to this action.*